UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT FRANKFORT

CIVIL ACTION NO. 3:07-CV-11-KKC

MARK BROWN, by and through his guardian,
DENISE THOMAS,                                                                        PLAINTIFF


v.                                          **OPINION AND ORDER**


ERNIE FLETCHER, et al.,                                                          DEFENDANTS

\* \* \* \* \* \* \* \*

        This matter is before the Court on the Motion to Dismiss filed by Defendants Liberty

Healthcare Corporation, Jacqueline Bouyea, Robert Ritz, and Casey Coffey.  For the reasons

stated below, the Defendants' Motion is GRANTED IN PART and DENIED IN PART.

**I.      Factual Background**

        Plaintiff Mark Brown**,** a minor, is a resident of Oakwood Community Center [hereinafter

"Oakwood"], a state institution for the care of mentally retarded individuals.  Brown is non-

verbal, and his diagnoses include severe mental retardation, autistic disorder, behavior disorder,

and other serious disabling conditions.  Because of his conditions, Brown is dependent on others

to care for and protect himself.  Brown was involuntarily committed to Oakwood in November

2003 and remains there to this day.  Brown alleges that he was severely, viciously, and repeatedly

beaten and abused during his residency at Oakwood.

        Oakwood is presently operated by Defendant Liberty Healthcare Corporation [hereinafter

"Liberty"], pursuant to a contract with the Commonwealth of Kentucky entered into on

November 1, 2005.  Oakwood was turned over to private management under Liberty due to the

State's determination that emergency conditions existed at Oakwood that threatened the health and safety of the residents.  Under the contract, Liberty undertook the management, administration, and operation of the Oakwood facility, as well as its employees and staff.  Liberty also assumed responsibility for the supervision, care, treatment, and habitation of Oakwood's residents, including Brown.  Liberty claims to have delivered training to its care staff in conformity with state law, and to have worked with every client and each client's Interdisciplinary Teams on issues of past harm and to develop plans for the prevention of future harm.  Pursuant to the contract, Liberty was to ensure that Oakwood complied with all applicable federal and state regulatory standards and requirements, and that each resident's federal and state rights were protected at all times.  Defendants Jacqueline Bouyea and Robert Ritz are Liberty officials who were in charge of Oakwood's day-to-day operations at various times during Brown's residency there.  Defendant Casey Coffey is a member of the direct care staff at Oakwood and is employed by Liberty.

In the Complaint, Brown describes several specific examples of the physical harm inflicted upon him at Oakwood.  Brown states that after being beaten and kicked January 1, 2006, he was transferred by his Interdisciplinary Team to another residence on January 9, 2006.  Brown asserts that he his Team knew that Brown would likely be in danger at the new residence because of the violent tendencies of the residents there.  Brown further alleges that he was attacked by one of the residents shortly after his transfer.  Brown also claims that he was repeatedly beaten with a broomstick by various Oakwood staff, including Defendant Coffey, from October 7, 2005 to June 6, 2006.  Brown finally asserts that Liberty failed to protect him from this abuse despite having continuing knowledge of it, and that Liberty also failed to investigate these incidents of

harm, failed to alert the proper authorities, failed to notify Brown's family of the situation or allow access to relevant records and reports, and failed to correct the abusive arrangement that Brown was enduring.

Brown has asserted numerous federal and state causes of action against the Defendants. Pursuant to 42 U.S.C. § 1983 and/or separate statutory rights of action, Brown claims violations of the Fourth and Fourteenth Amendments, the Medicaid Act, and Section 504 of the Rehabilitation Act. Pursuant to supplemental and diversity jurisdiction, Brown also brings several state-law claims against the Defendants, and asks for punitive damages as well. The Defendants moved to dismiss all these claims.

## II.    Legal Standard

On a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint should not be dismissed . . . unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (citation omitted). "The factual allegations in the complaint must be regarded as true. The claim should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheid v. Fanny Farms Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (quoting *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983)). Nevertheless, "a plaintiff's complaint will not survive a motion to dismiss under Rule 12(b)(6) unless it contains 'either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" *Uttilla v. City of Memphis*, 40 F. Supp. 2d 968, 970 (W.D. Tenn. 1999) (quoting *Scheid*, 859 F.2d at 436).

3

**III.     Analysis**

**A.     42 U.S.C. § 1983 Claims for Violations of Fourth and Fourteenth Amendments**

Brown brings four Constitutional claims against the Defendants pursuant to 42 U.S.C. § 1983.  First, Brown claims that the Defendants' conduct violated the Due Process clause of the Fourteenth Amendment by violating his right to be free from personal and emotional harm and from unjustified intrusions on his personal security.  Second, Brown claims the Defendants violated his right under the Fourth Amendment to be free from seizure, harm, and unjustified intrusions on his personal security.  Third, Brown claims that the Defendants violated the standard of care required of them under the Fourteenth Amendment relating to overseeing Brown's needs, including his bodily safety and protection from abuse, and relating to the need to provide adequate staff and reasonable training to secure these needs.  Fourth, Brown claims that the Defendants also violated the Fourteenth Amendment by failing to provide Brown proper care, treatment and habilitation services, and to provide these in accordance with acceptable standards of professional judgment.

The Defendants moved to dismiss these claims on three grounds: first, that they are not state actors; second, that even if they are state actors, they cannot be held liable under theories of respondeat superior and vicarious liability; and third, that they are also entitled to qualified immunity.

**1.     State Action**

Brown proceeds with these Constitutional claims under 42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a

4

person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations

omitted).  One acts under color of state law when one exercises power "possessed by virtue of

state law and made possible only because the wrongdoer is clothed with the authority of state

law." *United States v. Classic*, 313 U.S. 299, 326 (1941).  If a defendant's conduct satisfies the

state-action requirement of the Fourteenth Amendment, then the defendant is considered to be

acting under color of state law.  *West*, 487 U.S. at 49; *Lugar v. Edmondson Oil Co.*, 457 U.S.

922, 928 (1982).  Therefore, the Court must determine whether the Defendants, in managing the

operations of Oakwood, performed state action.

The Defendants to this action are not government employees or officials.  They are

private parties.  In certain circumstances, however, the actions of even private parties may be

deemed to be state action "when the conduct causing the deprivation of a federal right may be

fairly attributable to the state."  *Revis v. Meldrum*, 489 F.3d 273, 289 (6th Cir. 2007) (quoting

*Lugar v. Edmundson Oil Co.*, 457 U.S. 922, 937 (1982)).  This determination involves a two-part

inquiry.  "'First, the deprivation in question must be caused by the exercise of some right or

privilege created by the State or by a rule of conduct imposed by the state or by a person for

whom the State is responsible.'" *Id.* (quoting *Lugar*, 457 U.S. at 937).  And second, "'the party

charged with the deprivation must be a person who may fairly be said to be a state actor.'" *Id.*

(quoting *Lugar*, 457 U.S. at 937).

For a private actor-defendant's acts to be considered state action, "its actions [must] so

approximate state action that they may be fairly attributed to the state." *Lansing v. City of*

*Memphis*, 202 F.3d 821, 828 (6th Cir. 2000).  The United States Court of Appeals for the Sixth

Circuit uses three tests to determine if a private actor-defendant's conduct amounts to state

action.  These are commonly referred to as: 1) the public-function test; 2) the state-compulsion test; and 3) the symbiotic relationship or nexus test.  *Id.*; *Boykin v. Van Buren Twp.*, 479 F.3d 444, 452 (6th Cir. 2007) (quoting *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003)); *Lansing*, 202 F.3d at 828.  Each of these tests must be examined to determine if the Defendants' acts constitute state action.  Moreover, Brown places considerable emphasis on the Supreme Court case of *West v. Atkins*, 487 U.S. 48 (1988), as grounds for a finding of state action.  The Court will separately discuss this case in addition to the aforementioned three tests.

**a.      Public-Function Test**

The first of the state-action tests is the public-function test.  Under this test, "a private party is deemed a state actor if he or she exercised powers traditionally reserved exclusively to the state." *Chapman*, 319 F.3d at 833.  This test has typically been interpreted very narrowly, and has been utilized to find state action on the part of a private actor only in rare circumstances. *Id.* at 833-34.  The few examples of state action under this public-function test illustrate its lack of expansive utilization by the courts. *Id.*; *see also Flagg Bros. v. Brooks*, 436 U.S. 149, 157-58 (1978) (holding elections is public function); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352-53 (1974) (eminent domain is public function); *Marsh v. Alabama*, 326 U.S. 501, 505-09 (1946) (company-owned town is public function).

Importantly, when a court addresses the issue of state action under the public-function test, it must conduct a historical analysis of the activity in question to determine whether the activity truly is one that has been traditionally and exclusively performed by the state. *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003); *Ellison v. Garbarino*, 48 F.3d 192, 196 (6th Cir. 1995) ("Courts that have addressed this issue [public-function test] have typically

6

required some historical analysis to determine whether an action is one traditionally the exclusive prerogative of the state."). The Sixth Circuit has also made it clear that the burden is on the plaintiff to make this showing of historical evidence or argumentation to the court deciding the issue of state action. *Straub v. Kilgore*, 100 Fed. Appx. 379, 385 (6th Cir. 2004) (quoting *Wittstock*, 330 F.3d at 902); *Wittstock*, 330 F.3d at 902; *Ellison*, 48 F.3d at 196.

Under such directives, the Court cannot find that the housing, care, and treatment of involuntarily committed individuals is a function traditionally and exclusively reserved to the state. Plaintiff Brown has made no arguments and presented no evidence that would allow the Court to declare those such activities have indeed been the traditional exclusive prerogatives of the state, as opposed to that of private actors. Moreover, upon its own review of case law, the Court is convinced that current precedent would not support a finding of state action under the public function test. The Sixth Circuit has held that the involuntary commitment of individuals for their own safety does not constitute state action. *See Ellison*, 48 F.3d at 194-97. Though the *Ellison* Court was not presented with the historical evidence to properly reach a public function determination, it discussed the decisions of other courts that have utilized such historical information to find the that the public-function test is not satisfied by involuntary commitment. *See id.* at 195-96, 196 n.2. Furthermore, the Sixth Circuit has also held that the provision of mental health services is also not a traditional and exclusive public function. *See Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). Although these decisions are not precisely on all fours with the issue of housing, care, and treatment of the involuntarily committed, they at least properly caution a district court against extending public-function precedent into an unclear area when historical and precedential evidence has not even been presented to the court.

Considering the narrow range of activities that courts have decreed to be state action under the public function test, coupled with the Plaintiff's failure to produce the required historical analysis, the Court is left with no choice at this stage of the proceedings but to find that the public function test is not satisfied by the housing, care, and treatment of involuntarily committed individuals.

**b.     State Compulsion Test**

The second of the state-action tests is the state compulsion test. This test "requires that the state 'exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state.'" *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007) (quoting *Wolotsky*, 960 F.2d at 1335). For the activities of the private actor to constitute state action under this test, more is required than merely the approval or acquiescence of the state in the decisions or actions of the private actor. *See Blum v. Yaretsky*, 4557 U.S. 991, 1004 (1982).

Brown has neither argued nor alleged that the Defendants were coerced or encouraged by the state into committing any of the alleged acts against Brown. Moreover, as the Defendants point out, since the purpose of contracting out Oakwood's day-to-day management to Liberty was to correct the abusive environment at Oakwood, it would make no sense for the state to compel or encourage the acts of abuse alleged by Brown, as this would defeat the very purpose of the Oakwood-Liberty contract in the first place. The Court therefore finds that the state-compulsion test for state action is not satisfied in this case.

**c.     Symbiotic Relationship or Nexus Test**

The third of the state-actions tests is the symbiotic relationship, or nexus test. Under this

8

test, "the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Wolotsky*, 960 F.2d 1331, 1335 (6th Cir. 1992). As with the public-function test, the Court's review of case law reveals the application of this nexus test to be very restrictive. "[T]he Sixth Circuit has made clear that the ties between the private party and the State must be substantial." *Jackim v. City of Brooklyn*, 2007 U.S. Dist. LEXIS 20355, at *85 (N.D. Ohio Mar. 22, 2007) (citing *Wolotsky*, 960 F.2d at 1335); *see also Siskaninetz v. Wright State Univ.*, 175 F. Supp. 2d 1018, 1023 (S.D. Ohio 2001) (same); *Marchese v. Weeman*, 1993 U.S. Dist. LEXIS 11826, at *7 (E.D. Mich. July 24, 1993) (plaintiff "must establish a substantial degree of cooperative action" between state and private actor).

Determinations of state action under the nexus test necessarily depend on the unique facts and circumstances presented by each individual case. "The cases establish no clear standard for identifying a 'sufficiently close nexus.'" *Lansing v. City of Memphis*, 202 F.3d 821, 830 (6th Cir. 2000); *see also Lugar v. Edmundson Oil Co.*, 457 U.S. 922, 939 (1982) (state-action determination is a "necessarily fact-bound inquiry"). However, the Supreme Court and the Sixth Circuit have provided some guidance to the inquiry. Certain factors have been deemed insufficient, in and of themselves, to establish the required nexus between the private actor's complained-of conduct and the State. Extensive state regulation of a private entity's operations does not establish state action via the nexus test. *See, e.g., Rendell-Baker v. Kohn*, 457 U.S. 830 (1982); *Adams v. Vandemark*, 855 F.2d 312 (6th Cir. 1988); *Crowder v. Conlan*, 740 F.2d 447 (6th Cir. 1984). Public funding of nearly all of the private actor's activities, as well as the private actor's use of public property, are similarly insufficient to establish the required nexus. *See, e.g.,*

9

*Blum v. Yaretsky*, 457 U.S. 991 (1982); *Wolotsky*, 960 F.2d at 1336; *Crowder*, 740 F.2d at 450,

453.  The minority presence of public officials on the private actor's decision-making board also

does not satisfy the nexus test for state action.  *See, e.g., Jackson v. Metropolitan Edison Co.*,

419 U.S. 345 (1974); *Lansing*, 202 F.3d at 831; *Crowder*, 740 F.2d at 447.  Also, the utilization

of public services by private actors does not by itself establish the requisite nexus for state action.

*See, e.g., Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999); *Ellison v. Garbarino*, 48 F.3d

192 (6th Cir. 1995).

      Courts are to consider any combination of the above factors, or other unique facts, that

happen to be presented by the circumstances of the case before determining whether there is a

sufficient nexus between the state and the private entity to constitute state action.  Importantly, it

should also be remembered that for this state-action test to be satisfied, the required nexus must

be found between the specific complained-of actions of the private actor and the involvement or

influence of the State.  *See Wolotsky*, 960 F.2d at 1335 ("[I]t must be demonstrated that the state

is intimately involved in the challenged private conduct in order for that conduct to be attributed

to the state for purposes of section 1983."); *see also Straub v. Kilgore*, 100 Fed. Appx. 379, 385

(6th Cir. 2004) ("In order to show state action, the state must be 'intimately involved' with the

challenged conduct."); *Crowder*, 740 F.2d at 453 (explaining that plaintiff must demonstrate

nexus between the specific challenged action and the governmental involvement alleged to

provide the basis for a finding of state action).

      Under the guidance and precedent of the Sixth Circuit Court of Appeals relating to this

particular state-action test, the Court cannot find that Plaintiff Brown has established a sufficient

nexus between the alleged acts of the Defendants and the involvement of the Commonwealth of

Kentucky.  Though the Court recognizes that there are few very clear guiding principles in this area of the law, it is at least apparent that precedent counsels great caution in finding state action by virtue of a symbiotic relationship.

Numerous cases illustrate the restrictive approach the Sixth Circuit has taken with the nexus test, similar to its interpretation of the public function test.  For example, in *Cornett v. Mason Volunteer Fire Co.*, 1996 U.S. App. LEXIS 14444 (6th Cir. May 8, 1996), a private corporation was under contract with a township to provide firefighting and emergency medical services to the township.  The plaintiff claimed state action when she was suspended from her job at the corporation.  The corporation was solely dependent on the public for its revenues, it leased and used government property for its operations, it was required to submit audits to the government, and a government official sat on the advisory board that recommended the plaintiff's suspension.  *Id.* at *2, 6-7, 9-10.  The Court did not find state action under the nexus test, as nothing showed that the government was involved in the act of suspension itself.  *Id.* at *10.

In *Adams v. Vandemark*, 855 F.2d 312 (6th Cir. 1988), the plaintiff claimed state action for an alleged retaliatory dismissal from his employment at a non-profit corporation in the city of Caro, Michigan.  The corporation's purpose was to administer a state and federally funded public program to improve housing for low-income Caro residents.  *Id.* at 315.  The facility from which the corporation operated  was owned by Caro and leased back to the corporation at a nominal fee of one dollar annually.  *Id.* at 316.  The corporation was funded almost entirely by public sources, was subject to regulatory requirements, and one-third of its board of directors was composed of public officials.  *Id.* at 316-17.  No nexus-test state action was found in this arrangement.  The

11

Court explained that none of these ties between the private actor and the state appeared to play any role in the act of termination itself; there was no link to the challenged actions despite the government's general links to the corporation overall. *Id.* Also, there were no allegations that the government benefitted in any way from the defendants' challenged acts, precluding the existence of a symbiotic relationship between the acts and the government's involvement. *Id.* at 317.

In *Crowder*, 740 F.2d 447, a doctor at a Kentucky hospital claimed state action when he was denied emergency room privileges upon recommendation of the hospital's executive committee. The hospital facility was owned by Christian County, Kentucky, which had leased it to the private actor defendant. *Id.* at 452-53. The county played no role in the day-to-day operations, which were run entirely by the defendant organization. *Id.* The hospital was also regulated and funded by government and two members of its board of trustees were public officials. *Id.* at 450-52. Despite all these factors, the Court still held in *Crowder*, as in the other cases discussed, that state action was not present under the nexus test. "In sum, we find that the connections between the State and the Jennie Stuart Memorial Hospital are insufficiently linked to the challenged actions of the defendants to warrant a finding of state action . . . ." *Id.* at 453. Other examples are similarly instructive of the Sixth Circuit's restrictive position on the nexus test. *See, e.g., Sandoval v. Bluegrass Reg'l Mental Health-Mental Retardation Bd.*, 2000 U.S. App. LEXIS 17949 (6th Cir. July 11, 2000) (private regional mental healthcare facility receiving state funding and administering state assistance programs not state actor under nexus test); *Lansing*, 202 F.3d 821 (private entity running festival on public park grounds, where purpose is to enhance city life and attract business, and where minority of board members are selected by

public officials not state actor under nexus test); *Wolotsky*, 960 F.2d 1331 (private company that provides mental health services to the community, operating out of publicly owned facility, where government delegates provision of these community services to company, not state actor under nexus test).

The facts and circumstances of the instant case merit the same outcome as the above cases. The Oakwood facility is owned by the Commonwealth of Kentucky, and its day-to-day operations and management have been transferred to Liberty. This is very similar to *Crowder*, where the government owned the facility and the defendant operated it; *Adams* and *Wolotsky*, where the publicly owned facility was leased to the defendant at a nominal rate (thus allowing the defendant to operate it); and *Cornett* and *Lansing*, where the defendant conducted its operations on government property. Clearly, Liberty is subject to federal and state regulations in operating a home for the mentally retarded (since these types of homes are governed by extensive regulatory regimes), similar to the above cases. Moreover, Oakwood's operations were funded by the Commonwealth pursuant to its contract with Liberty. In all of the above cases, the defendants were publicly funded to some extent. Further, there are no allegations that Liberty's governing board contains any public officials, a factor present in several of the above cases where a nexus was not found despite these officials' presence.

Most importantly, there is nothing to indicate that the state had any influence or role in the specific challenged actions themselves—the alleged acts of abuse against Brown, and the alleged Medicaid Act violations. For the nexus test to be satisfied, the purported nexus must exist between the acts and the state, not simply between the defendant and the state. While it is true as a normative matter that the challenged actions would not have occurred but for the state,

13

since Liberty allegedly committed the acts in question and the state brought in Liberty, the same could be said in all of the cases discussed above.  The Complaint asserts that Liberty agents committed the challenged actions in a state facility.  Brown does not assert that the Commonwealth of Kentucky ever influenced the specific acts of abusing Brown in the variety of ways alleged or violating the Medicaid laws.  There are no allegations that state officials played a direct role in determining Liberty decisions or policies, such as through membership on Liberty's governing board.  We are left, therefore, with a private actor, paid with state funds, subject to state regulation, and operating on state property, that allegedly abused the trust of its charges.  Though this obviously establishes links between the government and Liberty Healthcare, these links are not clearly distinct from those found in Court of Appeals cases where a sufficient nexus between the challenged acts and the state was found lacking.  The Court therefore finds that the nexus, or symbiotic relationship test for state action is not satisfied in this case.

**d.**   ***West v. Atkins***

Brown has focused his attention almost exclusively on the effect of the Supreme Court case of *West v. Atkins*.  Brown asserts that under the analysis employed by the Court in *West*, the Defendants in the present action may properly be considered state actors.  In *West*, the plaintiff, a North Carolina state prison inmate, was treated by the defendant, a private physician, at a hospital operated by the state for the care of its inmates.  *West*, 487 U.S. at 43-44.  The defendant physician was under contract with the state to provide medical treatment to the state's inmates.  The plaintiff brought an Eighth Amendment claim, pursuant to 42 U.S.C. § 1983, against the physician over the physician's failure to provide proper medical treatment.  The Court held that the physician was a state actor, thus making him an appropriate party for a § 1983 action.  The

14

defendant's conduct in treating the plaintiff was "fairly attributable to the State" since the State had employed the defendant to perform that very treatment. *Id.* at 54. The State had a Constitutional obligation under the Eighth Amendment to provide adequate medical care to its prisoners. *Id.* The Court reasoned that, as a prison inmate, confined within the state prison system against his will, the plaintiff was entirely dependent on the State for his medical treatment. *Id.* at 54-55. This was reinforced by that fact that under North Carolina law, inmates had no right to seek medical treatment other than that given them by the state. *Id.* at 55. Thus, "the resultant deprivation was caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to punish West by incarceration and to deny him a venue independent of the State to obtain needed medical care." *Id.*

Additionally, the fact that the defendant was a private party under contract with the State, rather than formally a State employee, did not change the outcome of the Court's state-action analysis. "It is the physician's [defendant's] function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State." *Id.* at 55-56. The State was not relieved of its Constitutional obligation to provide adequate medical care to prisoners merely by contracting it out to private parties. "The State bore an affirmative obligation to provide adequate medical care to [the plaintiff]; the State delegated that function to respondent [the defendant]; and respondent voluntarily assumed that obligation by contract." *Id.* at 56.

Brown argues that the situation presented by this case merits the same treatment as that in *West*. As North Carolina did in *West*, the Commonwealth of Kentucky has delegated one of its Constitutional duties to the means of private contractors—here, the safety and care of those who,

like Brown, are involuntarily committed. *See Youngberg v. Romeo*, 457 U.S. 307, 319, 324 (1982); *see also Baker v. City of Detroit*, 217 Fed. Appx. 491 (6th Cir. 2007) (recognizing that these Constitutional rights apply to those who are involuntarily committed to state mental institutions). The state's contract with Liberty gave Liberty control of the management and operation of the Oakwood facility, staff, and residents, and required it to comply with all federal and state regulations governing health facilities like Oakwood. This is similar to the contract in *West*, which charged the doctor defendants with the medical care of the state's inmates. Brown analogizes his situation to that of the prison inmate in *West* as a further similarity between the two cases: both were placed into state custody against their will, and both were dependent on the state for their care. Brown also points out that the Sixth Circuit has extended the *West* analysis from prison medical care to prison housing and security. *Flint v. Ky. Dept. of Corrs.*, 270 F.3d 340 (6th Cir. 2001). Brown asserts that such factors warrant a further extension of *West* to the housing, care, and treatment of the involuntarily committed.

The true boundaries of *West*'s holding have yet to be fully explored within this circuit. An obvious question presented is whether *West* is but one specific application of the three previously discussed state-action tests, or whether it instead creates a new "functional test" for state action. *See Wolotsky*, 960 F.2d at 1337 (noting plaintiff's argument that *West v. Atkins* creates a new functional test for state action, but declining to decide the merits of this argument). Both parties seem to assume that *West* can actually be categorized under one or more of the three existing state-action tests. *See* Defendants' Memorandum in Support of Motion to Dismiss, at 5-11; Defendants' Reply Memorandum in Support of Motion to Dismiss, at 3-4 (*West* not discussed as a separate test for state action); *see also* Plaintiff's Memorandum in Response to

16

Defendants' Motion to Dismiss, at 14-19; *id.* at 19 ("Whether under the obvious "public function" analysis or under the "symbiotic relationship / nexus" analysis, both of which <u>West</u> partakes, Liberty . . . and its officers and employees embody action by and on behalf of the state . . . ."). The *West* analysis has received little treatment by the Sixth Circuit Court of Appeals. What little treatment there is, however, leads this Court to conclude that Liberty and its employees are not state actors even in light of *West*.

As noted, the Sixth Circuit has found the contracting out of prison housing and security to be state action under a *West*-type analysis. *Flint*, 270 F.3d 340. However, in reaching this conclusion, the Court compared the job responsibilities of the contractor in *Flint* to those of the contractor in *West* and stated that in both situations, the contractors "performed functions typically attributed to the State." *Id.* at 351. In other words, it appears that the *Flint* contractors, like the *West* contractors, were held state actors under an application of *the public-function test*. Furthermore, in *Collyer v. Darling*, 98 F.3d 211 (6ᵗʰ Cir. 1996), where a private psychiatric institution was not held to be a state actor, the Court explicitly stated that the Supreme Court "utilized the public function test" in deciding *West v. Atkins*. *Id.* at 232. Also, in *Skelton v. Pri-Cor*, 963 F.2d 100 (6ᵗʰ Cir. 1991), the Court found state action when the state contracted out the medical care of state inmates, as North Carolina did in *West*. The Court cited *West* as support for this holding. *Id.* at 102. However, the language of the Court's holding in finding state action touched on both the public function test and the nexus test. *Compare id.* ("As a detention center, Pro-Cor [sic] is no doubt performing a public function traditionally reserved to the state."); *with id* ("'There is a sufficiently close nexus between the State and the challenged action of [Pri-Cor] so that the action of the latter may be fairly treated as that of the State itself.'" (quoting *Jackson*,

17

419 U.S. at 351)).  Apparently, the Court was viewing the *West* analysis through the lens of the public function and nexus state-action tests.

Other Sixth Circuit cases have also repeatedly categorized *West v. Atkins* under the public function test.  *See, e.g., Durante v. Fairlane Town Ctr.*, 201 Fed. Appx. 338, 340 (6th Cir. 2006); *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 636 (6th Cir. 2005); *Bell v. Mgmt. & Training Corp.*, 122 Fed. Appx. 219, 222 (6th Cir. 2005); *Chapman v. Higbee Co.*, 319 F.3d 825, 833 n.8 (6th Cir. 2003); *Collyer*, 98 F.3d at 232; *Cotten v. Gen'l Motors Fisher-Body Div.*, 1996 U.S. App. LEXIS, at *3 (6th Cir. Feb. 15, 1996); *Wolotsky*, 960 F.2d at 1335.  Moreover, every Sixth Circuit state-action holding where the state contracted out a Constitutional duty to private actors (as in *West*) involved prisons and prison inmates.  *See, e.g., Flint,* 270 F.3d 340 (housing and security of prisoners); *Skelton*, 963 F.2d 100 (operating prisons); *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989) (medical care of prisoners).  According to Sixth Circuit case law, these actions are considered public functions.  *See Flint*, 270 F.3d at 351 (housing and security for inmates are "functions typically attributed to the state"); *Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993) (providing medical services to prison inmates is a "traditional state function" (citing *West*, 487 U.S. at 54)).[1]

In sum, though appellate guidance on this issue is rather sparse, the Court concludes that

---

[1] Defendants argue in their Reply Memorandum that whether operating prisons can be considered a traditionally public function, and thus supportive of state action under a public function analysis, is undercut by the Supreme Court case of *Richardson v. McKnight*, 521 U.S. 399 (1997), as explained by the Fourth Circuit in *Holly v. Scott*, 434 F.3d 287 (4th Cir. 2006).  It is not necessary for the Court to consider this argument.  Even assuming arguendo that the Supreme Court would no longer consider prison operation to be a traditionally exclusive public function, this does not change the fact that the Sixth Circuit has historically understood this and other prison/inmate matters to be such public functions.  This understanding seems to have driven the Sixth Circuit's interpretation of *West v. Atkins* as an application of the public function theory.  It does not appear that the Sixth Circuit has reconsidered its interpretation of *West*'s scope in light of *Richardson v. McKnight*.  That interpretation is therefore still binding on this Court.

the Sixth Circuit Court of Appeals has interpreted *West v. Atkins* as an application of the public-function test, or to a lesser extent, the nexus test.  Therefore, when this Court considers Brown's case in light of *West*, it must utilize the more stringent public-function analysis, rather than a new, unbounded "functional" analysis whereby state action may automatically be found when a Constitutional duty is delegated to a private actor.  Since the Court has already undertaken and rejected state-action inquiries under both the public-function and nexus tests, no further state-action analysis would be necessary or useful in light of Sixth Circuit precedent.  The Defendants are not state actors, and as such, cannot be liable under 42 U.S.C. § 1983.  Since the state-action requirement is not satisfied, the Court need not consider the Defendants' arguments regarding supervisor liability and qualified immunity.  The Defendants' Motion to dismiss Brown's § 1983 claims is granted.

**B.     Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**

Brown has also brought claims against the Defendants for alleged violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Brown specifically alleges that "[a]ll Defendants' actions discriminated against Plaintiff Mark Brown, and excluded him from participation in the programs and services at Oakwood, on the basis of his disability, including, inter alia, his behavior disorder."  First Amended Complaint, ¶ 135.

Section 504 of the Rehabilitation Act of 1973 prohibits discrimination against disabled individuals by recipients of federal funding.  *Barnes v. Gorman*, 536 U.S. 181, 185 (2002).  The statute reads as follows: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal

19

financial assistance . . . ."  29 U.S.C. § 794(a) (2000).  Thus, a cause of action under Section 504

consists of four elements:

> (1) The plaintiff is a "handicapped [disabled] person" under the Act; (2) The
> plaintiff is "otherwise qualified" for participation in the program; (3) The plaintiff
> is being excluded from participation in, being denied the benefits of, or being
> subjected to discrimination under the program solely by reason of his handicap
> [disability]; and (4) The relevant program or activity is receiving Federal financial
> assistance.

*Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030-31 (6th Cir. 1995).

Brown has satisfactorily alleged all four of these required elements.  It does not appear to

be disputed that Brown satisfies the first two elements.  For the third element, Brown alleged

being "excluded . . . from participation in the programs and services at Oakwood, on the basis of

his disability."  First Amended Complaint, ¶ 135.  "Program or activity" is defined to include "*all*

*of the operations of* a department, agency, special purpose district, *or other instrumentality of a*

*State* or of a local government."  29 U.S.C. § 794(b)(1)(A).  The Oakwood facility itself is clearly

an "instrumentality of a State."  The Court construes Brown's Complaint as alleging

discriminatory exclusion from the "programs and services" of an "instrumentality of a State,"

which is sufficient to survive a motion to dismiss.

As for the final element, the need for the defendant to be a recipient of federal funding,

Brown specifically alleged that "Defendant Liberty Healthcare Corporation was paid by the

Commonwealth of Kentucky through and with federal funding."  First Amended Complaint, ¶

134.  It is apparently undisputed that Liberty Healthcare Corporation is a recipient of federal

funding, making it an otherwise proper defendant under Section 504.  Unlike Liberty Healthcare

Corporation, however, the other named Defendants in this case are individuals.  Numerous courts

have held that an individual can only be personally liable under the Rehabilitation Act where the

individual is in a position to accept or reject federal funds on behalf of the organization

defendant.  *See, e.g., U.S. Dep't of Transpt. v. Paralyzed Veterans of Am.*, 477 U.S. 597 (1986);

*Bartlett v. N.Y. State Bd. of Law Exam'rs*, 156 F.3d 321 (2d Cir. 1998); *Grzan v. Charter Hosp.*

*of Nw. Ind.*, 104 F.3d 116 (7th Cir. 1997); *Gallagher v. Croghan Colonial Bank*, 89 F.3d 275 (6th

Cir. 1996); *Bentley v. Cleveland Bd. of County Comm'rs*, 41 F.3d 600 (11th Cir. 1994).  Brown

has not alleged that any of the individual Defendants were in a position to accept or reject federal

funding on behalf of Liberty.  Therefore, Section 504 claims cannot lie against any of the

individual Defendants.

The Defendants have asserted that Brown's Rehabilitation Act claims are actually

asserting discrimination based on the degree of his disability versus that of the other residents of

Oakwood.  The Defendants cite *People First of Tennessee v. Arlington Developmental Center*,

878 F. Supp. 97 (W.D. Tenn. 1992), for the proposition that this is not a viable claim under the

Rehabilitation Act.  However, the Complaint instead generally states that Brown was excluded

from participation in Oakwood's programs or services, not that other residents got treated better

than he did with respect to these services.  Whatever the legal merits of *People First*, the Court

does not believe the case's reasoning is implicated.  However, if discovery reveals that Brown's

Rehabilitation Act claims are indeed fashioned as the Defendants describe them, then the Court

will reconsider the *People First* argument at that time.

The Defendants have also argued that Brown is barred from bringing his Section 504

claims because such claims cannot be brought pursuant to 42 U.S.C. § 1983.  In support of this

proposition, Defendants cite to *Moxley v. Vernot*, 555 F. Supp. 554, 560 (S.D. Ohio 1982).

There is conflicting authority from the Sixth Circuit Court of Appeals, however, indicating that §

1983 *can* be used to bring Section 504 claims. *See Pendleton v. Jefferson Local Sch. Dist. Bd. of Edu.*, 1992 U.S. App. LEXIS 6294, at *19-22 (6th Cir. Mar. 25, 1992) (§ 504 claims may be brought under § 1983); *see also Gean*, 330 F.3d at 775-76 (acknowledging that there is conflicting case law about whether § 504 claims may be brought under § 1983). Fortunately, we need not resolve this particular issue as the Sixth Circuit has also held that claims may be brought directly under the Rehabilitation Act itself, as an alternative to proceeding under § 1983. *Gean*, 330 F.3d at 774-75 ("An individual claiming that a recipient of federal funds has violated § 794 has the rights and remedies set forth in Title VI of the 1964 Civil Rights Act . . . including the right to bring a direct cause of action.").

The Court finds that Brown has sufficiently pled a claim against Defendant Liberty, but not against any of the other Defendants. The Defendants' Motion to Dismiss Brown's Rehabilitation Act claims is therefore granted in part and denied in part.

**C.     Medicaid Claims**

Brown has also asserted claims under the Medicaid Act, 42 U.S.C. § 1396 et seq., against the Defendants. Specifically, Brown alleges that the Defendants violated several statutory requirements under the Medicaid Act, including failing to provide "active treatment" to Brown, 42 U.S.C. § 1396d(d)(2), failing to "meet such standards as may be prescribed by [the federal government]," 42 U.S.C. § 1396d(d)(1), and failing to provide Brown and his family with "a written plan of service prior to admission," 42 U.S.C. § 1396a(a)(31). Similarly, Brown alleges that the Defendants have also violated various provisions of the Medicaid regulations, under 42 C.F.R. §§ 483.400, 483.420, and 483.440. The Defendants offer no substantive defense to these allegations. Instead, they contend that Brown can only assert these Medicaid claims pursuant to a

42 U.S.C. § 1983 cause of action.  Because Brown is barred from asserting § 1983 against them, they argue, he cannot raise the Medicaid claims against them either.

The Court assumes, without deciding the matter, that the aforementioned Medicaid Act provisions and regulations are privately enforceable via 42 U.S.C. § 1983.  Since the Defendants are not state actors, § 1983 cannot be utilized for relief against any harms they may have committed against Brown, including the alleged Medicaid violations.  Moreover, the Court has found no authority for the proposition that these Medicaid provisions and regulations are privately enforceable in any way other than § 1983, namely, through a private right of action within the Medicaid Act itself.  Brown is therefore left with no avenue to enforce the Medicaid provisions he claims have been violated.  The Defendants' motion to dismiss Brown's Medicaid claims is granted.

**D.     Diversity of Citizenship Jurisdiction is Inappropriate**

Brown asserts both supplemental jurisdiction, under 28 U.S.C. § 1367, and diversity of citizenship jurisdiction, under 28 U.S.C. § 1332, as grounds for this Court to review his various state-law claims against the Defendants.  Under 28 U.S.C. § 1332, complete diversity between all plaintiffs and all defendants is required for a federal court to exercise jurisdiction based on diversity of the parties.  *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999); *Thomas v. Bd. of Trustees*, 195 U.S. 207 (1904); *Strawbridge v. Curtis*, 7 U.S. (3 Cranch) 267 (1806).  Furthermore, when parties are added to a proceeding via an amended complaint, complete diversity of the parties is to be reassessed in light of the amended complaint.  *Curry v. U.S. Bulk Transp., Inc.*, 462 F.3d 536 (6th Cir. 2006).

In this case, both Plaintiff Brown and the direct care defendants are citizens of Kentucky.

23

Complete diversity therefore does not exist between the parties, and jurisdiction under 28 U.S.C. § 1332 is improper.  Accordingly, the only possible avenue of jurisdiction for the Court to review Brown's various state-law claims is through 28 U.S.C. § 1367 supplemental jurisdiction, which is reviewed below.

**E.     Supplemental Jurisdiction Over State-Law Claims**

Brown has asserted supplemental jurisdiction under 28 U.S.C. § 1367 as a basis for his eleven state-law claims against the various Defendants.  "[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367 (2000).  The Court has dismissed all of Brown's federal claims except for his claim against Defendant Liberty under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Therefore, in order for this Court to exercise jurisdiction over Brown's state-law claims, it must determine that there is sufficient basis to believe, at this point in the proceedings, that the allegations in these various state-law claims "form part of the same case or controversy" as the allegations in the remaining Rehabilitation Act claim.

Brown characterizes the allegations regarding his Rehabilitation Act claim in the following way: "All Defendants' actions discriminated against Plaintiff Mark Brown, and excluded him from participation in the programs and services at Oakwood, on the basis of his disability, including, inter alia, his behavior disorder."  First Amended Complaint, ¶ 135.  Since Brown generally asserts that "*all* Defendants' actions" played a part in his disability discrimination claim, such a description of this federal claim would necessarily include in its

24

purported scope all allegations contained in the state-law causes of action.  A brief perusal of the eleven state-law claims, as described in the First Amended Complaint, indicates that they all relate to alleged instances of abuse, inappropriate treatment of Brown, and/or improper training or supervision of Oakwood staff.  *See* First Amended Complaint, ¶¶ 141-206.  Such allegations would appear to "form part of the same case or controversy" as a purported Rehabilitation Act claim that cites "all Defendants' acts" as the basis of injury.  At this early stage of the proceedings, and in light of the lenient notice pleading requirement of the Federal Rules of Civil Procedure, the Court believes that Brown's First Amended Complaint sets forth a facially sufficient basis for the exercise of supplemental jurisdiction over the eleven state-law claims.  However, if discovery should later reveal that the state-law claims and the Rehabilitation Act claim do not in fact "form part of the same case or controversy," the Court will reassess its retention of jurisdiction.  Furthermore, if the substantive legal merits of Brown's Rehabilitation Act claim are later found to be lacking, the Court may also exercise its statutory discretion not to hear the state-law claims.  *See* 28 U.S.C. § 1367(c)(3) (2000) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").  The Defendants' Motion to Dismiss is therefore denied with respect to the state-law causes of action.

WHEREFORE, For the reasons stated above:

1.      The Defendants' Motion to Dismiss is GRANTED for All Defendants with respect to Plaintiff's First, Second, Third, Fourth, and Fifth Causes of Action;

2.      The Defendants' Motion to Dismiss is GRANTED for Defendants Bouyea, Ritz, and Coffey with respect to Plaintiff's Sixth Cause of Action;

25

3.      The Defendants' Motion to Dismiss is DENIED for All Defendants with respect to Plaintiff's Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, and Seventeenth Causes of Action; and

4.      The Defendants' Motion to Dismiss is DENIED for Defendant Liberty Healthcare Corporation with respect to Plaintiff's Sixth Cause of Action.

Dated this 7th day of January, 2008.

**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**